FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

97 JAN 31  PM 4: 53

U.S. DISTRICT COURT
N.D. OF ALABAMA

LOUISE SAHAG, et al.,          )
                              )
        Plaintiffs,            )
                              )      CIVIL ACTION NO.
v.                            )
                              )      CV 96-AR-0307-M
TIM MITCHELL, et al.,          )
                              )
        Defendants.            )

ENTERED

JAN 31 1997

**MEMORANDUM OPINION**

The above-styled action was initiated to challenge the
constitutionality of the configuration of the District 4 of the
Alabama State Board of Education voting districts.  The issue was
first presented to this court in 1994, in *Sahag v. Mitchell*, No.
CV-94-AR-0317-M  (N.D. Ala.  1994)(*Sahag I*).   This court then
abstained and dismissed the case without prejudice. In 1993, prior
to filing their first complaint concerning the constitutionality of
District 4 in federal court, plaintiffs had initiated three
separate actions in state court, namely, *Gravois v. Snowden*, No.
CV-93-385-NJ (Shelby County, Ala., Cir. Ct. 1993),   *Hayden v.
Bennett*, No. CV-93-1032 (Montgomery County, Ala., Cir. Ct. 1993),
and *Collins v. Bennett,* Nos.  1930468, 193043, 1995 WL 577029 (Ala.
1995).  When plaintiffs failed to receive what they perceived as an

1

adequate remedy in the state forums they filed the present action
(*Sahag II*).   Subsequently, this court approved   intervenors'
amended motion to intervene.   Intervenors purported to undertake
the protection of the rights voters in District 7.   From the
outset, the state defendants remained virtually neutral and
impartial observers, conceding the unconstitutionality of District
4 and therefore of another district or districts on the domino
principal.

By order of November 27, 1996, this court adopted the report
of its Special Master and established new voting district
boundaries for the State Board of Education and mandatorily
enjoined the Secretary of State and the State of Alabama to
implement these new boundaries in future State Board of Education
elections.

Plaintiffs and intervenors now seek to recover, pursuant to 42
U.S.C. §§ 19731(e) and 1988(b), and Rule 54(d) F.R.Civ.P.,
attorneys' fees and expenses.   Pursuant to the reasoning below,
plaintiffs' motion is due to be granted as to work and expenses
directly related to the *Sahag I* and *Sahag II* litigations, though
not for work and expenses incurred in state court litigation.
Intervenors' motion is due to be denied.

## A. Plaintiffs

Plaintiffs in the above styled action seek reasonable attorneys' fees from the State of Alabama and the Secretary of State James Bennett ("defendants" or "state defendants"). The court determines that plaintiffs are entitled to $145,941.91 in attorneys' fees and expenses.

### 1. Prevailing Party

In order to recover attorneys' fees under 42 U.S.C. §§ 1973l(e) or 1988(b) plaintiffs must be "prevailing parties." *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983). The state does not contest the claim that plaintiffs are prevailing parties, except as described below. This court determines that plaintiffs are indeed prevailing parties.

### 2. State Court Litigation

42 U.S.C. §§ 1973l(e) and 1988(b) permit a trial court, "in its discretion" to award "the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" for "any action or proceeding to enforce" either "the voting guarantees of the fourteenth or fifteenth amendments" or to enforce certain civil rights statutes.[1] Plaintiffs and intervenors in the

---

[1]For purposes of interpretation §§ 1973l and 1988 are indistinguishable. *See Brooks v. Georgia State Bd. of Elections*, 997 F.2d 857, 861 (11th Cir. 1993).

3

above-styled action seek their attorneys' fees as costs. Plaintiffs endeavor not only to be reimbursed for costs directly related to the above-styled cause of action, but also for the attorneys' fees that were generated in similar and related litigation, namely *Sahag v. Mitchell*, No. CV-94-AR-0317-M (N.D. Ala. 1994)(*Sahag I*), *Gravois v. Snowden*, No. CV-93-385-NJ (Shelby County, Ala., Cir. Ct. 1993), *Hayden v. Bennett*, No. CV-93-1032 (Montgomery County, Ala., Cir. Ct. 1993), and *Collins v. Bennett*, Nos. 1930468, 193043, 1995 WL 577029 (Ala. 1995). State defendants do not object to the hourly rate requested by plaintiffs for attorneys' fees. They do object to the scope of plaintiffs' request and the total number of lodestar hours claimed.

As an initial matter state defendants assert that, as to *Sahag II*, all pre-filing attorneys' work claimed by plaintiffs is non-recoverable. Plaintiffs contend that the pre-filing work is recoverable because said work was of a kind "reasonably expended on the litigation" and because while not directly related to the litigation (with the exception of drafting the complaint in *Sahag II*), it was of a kind "both useful and necessary" to the resolution of *Sahag II*. *See Webb v. Board of Educ. of Dyer County*, 471 U.S. 234, 236, 242, 105 S. Ct. 1923, 1925, 1928 (1985).

4

In its 1980 opinion in *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S. Ct. 2024 (1980), the Supreme Court began addressing the problem of recoverability of attorneys' fees for work done tangentially to, but not directly for, certain litigation. The *Carey* Court held that a plaintiff could recover attorneys' fees pursuant to § 706(k) of Title VII[2] for "work performed pursuing a state administrative remedy to which the complainant was referred pursuant to the provisions of Title VII." *Webb,* 471 U.S. at 240, 105 S. Ct. at 1927 (quoting *Carey*, 447 U.S. at 71, 100 S. Ct. at 2024)(internal quotes omitted). Five years after *Carey*, the Court in *Webb* limited the *Carey* holding. In *Webb* the Court noted the differences between a Title VII cause of action, asserted in *Carey*, and a § 1983 cause of action, asserted in *Webb*. *See id.* at 240-41, 105 S. Ct. at 1927. Title VII "expressly requires the claimant to pursue available state remedies before commencing proceedings in the federal forum", whereas "[t]here is no comparable requirement in § 1983 . . . ." *Id.* Where a federal statute does not specifically require plaintiffs to appeal to a forum other than the federal courts, petitioners are

---

[2]The Supreme Court has treated the language providing attorneys' fees in § 706(k) of Title VII and 42 U.S.C. § 1988(b) as equivalent. *See Webb v. Board of Educ. of Dyer County,* 471 U.S. 234, 236 n.1, 240, 105 S. Ct. 1923, 1925 n.1, 1927 (1985).

"not automatically entitled to claim attorney's fees for time spent in the administrative process . . . ." *Id.* at 241, 105 S. Ct. at 1927-28.

The Court held that the amount of reasonable attorneys' fees to be awarded in such cases depends on the facts and circumstances of each case. *Id.* at 241-242, 105 S. Ct. at 1928 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S. Ct. 1933, 1937 (1983)). The circumstances surrounding *Webb* led the court to reject the contention that the fees claimed were recoverable for all work done prior to the filing the complaint to the extent they that are related to that complaint. The Court found that "it is difficult to treat time spent years before the complaint was filed as having been 'expended on the litigation' or to be fairly comprehended as 'part of the costs' of the civil rights litigation." *Id.* The *Webb* Court found a clear dividing line between the administrative proceedings held prior to the law suit and the work done for the law suit itself. This finding was supported by the fact that "petitioner made no suggestion below that any discrete portion of the work product from the administrative proceedings was work that was *both useful and of a type ordinarily necessary* to advance the civil rights litigation to the stage it reached before settlement."

6

*Id.* at 243, 105 S. Ct. at 1928-29.  In the instant case plaintiffs have asserted that their work in the state courts directly benefited and was indeed utilized for the *Sahag II* case.

Justice Stevens' "both useful and of a type ordinarily necessary" language left pregnant the idea that if a petitioner could somehow prove that an attorney's work done for prior administrative or state court proceedings was both useful and necessary to the outcome of some federal voting rights or civil rights litigation, then payment for such work could be recovered pursuant to the relevant attorney's fee statute. It was not long before the Court began to find instances where such administrative and state court work was "useful and necessary" to some litigation.

In *Pennsylvania v. Delaware Valley Citizens Council*, 478 U.S. 546, 106 S. Ct. 3088 (1986), *opinion supplemented by* 483 U.S. 711, 107 S. Ct. 3078 (1987), the Court allowed plaintiffs to recover attorneys' fees for work done after a consent decree was entered pursuant to the Clean Air Act.  The Court found that the attorneys' fees provisions of the Clean Air Act and § 1988 were nearly identical, and noted that some courts had allowed recovery of post judgment monitoring in the context of § 1988 consent decrees.  The work recoverable in *Delaware Valley* included "monitoring

7

Pennsylvania's performance under the consent decree," submitting

comments to Pennsylvania's proposed regulations, and post-consent

decree work, including brief writing, before the Environmental

Protection Agency when Pennsylvania sought to limit the geographic

scope of the consent decree. *Id.* at 550, 552-53 n.1, 556-57, 106

S. Ct. at 3090, 3092 n.1, 3093-94. The Court found that in both

the context of § 1988 and the Clean Air Act, attorney's fees were

recoverable as against the state in order to encourage private

citizens to vindicate their statutory and constitutional rights

that might otherwise not be redressed. *Id.* at 560, 106 S. Ct. at

3095. The Court held that plaintiffs' post-consent decree

enforcement efforts were "useful and of a type ordinarily

necessary" to secure the final result obtained from the prior

litigation. *Id.* at 561, 106 S. Ct. at 3096 (quoting *Webb*, 471 U.S.

at 243, 105 S. Ct. at 1928). The Court held that the post-consent

decree work was necessary to protect rights protected pursuant to

the consent decree and that the decision to award the fees was well

within the district court's "zone of discretion." *Id.*

In *North Carolina Department of Transportation v. Crest

Street*, 479 U.S. 6, 107 S. Ct. 336 (1986), the Court again

addressed the "useful and necessary" language of *Webb*. *Crest*

8

*Street* presented a question "whether a court may award attorney's fees under [§ 1988], in a separate federal action not to enforce any of the civil rights laws listed in § 1988 but solely to recover attorney's fees." *Id*. at 7, 107 S. Ct. at 337.   The Court first noted that "[t]he legislative history clearly envisions that attorney's fees would be awarded for proceedings only when those proceedings are part of or followed by a lawsuit." *Id*. at 14, 107 S. Ct. at 341.   The Court again recognized that even if prior proceedings were not proceedings directly to enforce one of the civil rights enumerated in § 1988 that "the discrete portion of the work product from the administrative proceedings that was both useful and necessary to advance the civil rights litigation to the stage it reached before settlement, can be part of the attorney's fees under § 1988." *Id*. (internal quotations and cites admitted). However, the Court held that only a court, like this one, sitting to enforce certain enumerated civil rights could grant attorney's fees. The court did not expound on how the "useful and necessary" language was to be interpreted, only that it was available.

The Supreme Court case law has made relatively clear that attorney work on "useful and necessary" proceedings tied inextricably to civil rights or voting rights cases may be

9

compensated at the discretion of the trial judge when the proceedings are brought in a litigation to enforce the disputed rights. Specific instances where the Supreme Court has awarded such fees have occurred only where there was a post-consent decree order to enforce rights pursuant to the consent decree, see Delaware Valley, or where the state court or administrative proceedings were mandatory under a specific federal statute, see Carey; see also Sullivan v. Hudson, 490 U.S. 877, 109 S. Ct. 2248 (1989)(discussing mandatory Social Security administrative hearings after remand from federal court). The Supreme Court has disallowed fees for state administrative hearings that are not proceedings to enforce an enumerated civil right statute or voting rights statute. See Webb 471 U.S. at 241, 105 S. Ct. at 1927-28 (state tenure rights hearing is not a proceeding to enforce 42 U.S.C. § 1983).

Federal circuit and district courts have struck out to fill in the interstices, more like broad crevasses, of the "necessary and useful" language that has been applied in so few Supreme Court cases. Following Delaware Valley, the Eleventh Circuit in Brooks v. George State Bd. of Elections, 997 F.2d 857 (11th Cir. 1993), a Voting Rights Act case, held that post-judgement Section 5 Voting Act preclearance work was work necessary, useful, and crucial to

10

the underlying litigation. However, the court found that any preclearance work done *before* the entry of the district court's order was not compensable. *Id*. at 866-67. In *Loranger v. Stierheim,* 10 F.3d 776, 782 (11th Cir. 1994), the Eleventh Circuit found that "time expended independent of the federal litigation is not compensable." The Eleventh Circuit cited *Brantley v. Surles*, 804 F.2d 321, 325 (5th Cir. 1988), where the Fifth Circuit denied plaintiffs' request for attorneys' fees expended in state court litigation. The Fifth Circuit noted that plaintiffs, unlike plaintiffs in *Carey* and like plaintiffs in *Webb*, had the choice of where to bring their suit and what causes of action to assert. They chose to assert only state law claims, and therefore the efforts expended in state court were not compensable. *Brantley*, 804 F.2d at 325.

The courts have therefore been more liberal in granting post-judgment fees where the work supporting said fees has been performed in order to provisions of a civil rights or voting rights judgment or where post-judgment proceedings have been instituted to protect the rights or liberties secured by the judgements. Pre-present-litigation work has seemingly been limited to those proceedings that have been required by federal statute, like in

11

*Carey*.  While the "useful and necessary" language of *Webb* seemingly related to pre-litigation work by attorneys, it has been applied in the Supreme Court only to cases where post-judgment attorneys' work has been conducted. Simply because this is the case, the court does not close its eyes to the *Webb* language and to the proposition that certain pre-litigation attorney work related to and both useful and necessary to the present litigation may be compensable.

Plaintiffs acknowledge the apparent limitations of the useful and necessary language cited above, namely that pre-litigation attorneys' fees, for work not directly relating to the disputed case before the court, have been awarded almost exclusively under the *Carey* rationale.  To support their argument that their state court litigation was useful and necessary to the above-styled litigation to enforce the Voting Rights Act and other civil rights statutes, plaintiffs analogize the requisite petition to the state or administrative forum that made the *Carey* fees collectable to the abstention and dismissal by this court of *Sahag I*.

Plaintiffs cite two post-*Carey* circuit court decisions (one was also post-*Webb*) to support this proposition.  In *Bartholomew v. Watson,* 665 F.2d 910, 911 (9th Cir. 1982), a federal district court stayed a § 1983 suit brought to "declare unconstitutional and

12

enjoin administrative practices of the Oregon State Corrections Divisions" under the doctrine of Pullman abstention, pending a ruling in the state courts on the disputed statute. The Ninth Circuit determined:

> The state court action was initiated and pursued solely because of the filing of the section 1983 civil rights claim in the federal court. The state issues were substantially the same as those raised in the federal claim. The parties stipulated to the suspension of the federal action and to the testing in Oregon courts of pertinent state statutes which might have been dispositive of the section 1983 claim. . . . The initial determination of potentially conclusive state law issues was an integral part of the section 1983 claim and as such was a necessary preliminary to the enforcement of 42 U.S.C. § 1983.

> The Supreme Court's analysis of the scope of an attorney's fees statute similar to 42 U.S.C. § 1988 [in *Carey*] is instructive. . . . The Supreme Court stated that failure to award fees for mandatory state proceedings would inhibit the enforcement of a meritorious discrimination claim.

> The same factors which support an award of fees for related state proceedings under § 706(k) militates for an award for closely related state court actions under section 1988.

***

> If we were to hold that legal work done in a state court to vindicate rights recognized under section 1983 could not be compensated serious strains between the state and federal court systems might develop. State defendants would be required to seek abstention until involved state law was adjudicated in state courts. Plaintiffs seeking relief under section 1983 would be compelled to oppose any move from the federal court, despite the fact that an initial determination

13

of certain matters by the state court might simplify or even moot the federal action because of the loss of the right to claim attorney's fees under section 1988. A plaintiff's attorney would be penalized if some of his client's section 1983 claims were disposed of in a state forum. The ability to obtain counsel would therefore suffer. This double standard of awarding attorney's fees would encourage forum shopping and interfere with efficient allocation of issues and cases between the state and federal systems.

Having determined that the state court proceedings were an essential step in the presentation of the inmates' section 1983 claim because of the *Pullman* abstention rule, we can summarily reject state appellants' argument that attorney's fees cannot be awarded because the Oregon court proceedings were final before the enactment of section 1988.

*Bartholomew*, 665 F.2d at 912-14 (internal citations omitted). Of course, this decision was pre-*Webb*, so it might have been limited by *Webb's* constriction of the *Carey* holding, as applying only to "statutes that expressly require the claimant to pursue available state remedies before coming to the federal forum." *Webb*, 471 U.S. at 240, 105 S. Ct. at 1927. It must be remembered that in *Webb* plaintiff sought attorneys' fees for pursuing state administrative claims separately from their § 1983 action; however, no abstention doctrine was employed or discussed in *Webb*.

The First Circuit, in *Exeter-West Greenwich Regional School District v. Pontarelli*, 788 F.2d 47 (1st Cir. 1986), addressed the abstention doctrine and attorneys' fees post-*Webb*. In *Exeter-West*,

14

plaintiffs sued the Commissioner and Associate Commissioner of Education of the State of Rhode Island in federal district court alleging violations of the first and fourteenth amendments of the United States Constitution when the Commissioner interpreted a Rhode Island law to require plaintiff school district to pay tuition for students, pursuant to Rhode Island statute, for religious education. *Id*. at 48-49. The federal § 1983 claim was deemed moot when the Rhode Island Supreme Court determined that the Commissioner had misconstrued the Rhode Island statute. Plaintiffs then sought attorneys' fees pursuant to § 1988. *Id*. at 49. The district court had, *sua sponte* certified the question of the interpretation of the statute to the Rhode Island Supreme Court. *Id*. The First Circuit decided that the issue certified to the Rhode Island Supreme Court was "in litigation" because pursuant to the *Pullman* and *Colorado River* abstention the construction of the Rhode Island statute was necessary before the district court could have reached the constitutional issues presented. *Id*. at 51. The First Circuit claimed that it was necessary, in order to accommodate the doctrines of federalism and abstention to allow plaintiffs to recover attorneys' fees "in certification cases." *Id*. The court then acknowledged *Bartholomew* and attempted to reconcile

15

it with *Webb*. *Id.* at 51-52. The court distinguished *Webb*, where
fees for the state action were denied, on the grounds that

> those proceedings were pursuant to state administrative
> remedies which were concluded before the federal § 1983
> action was filed. Because there is no exhaustion
> requirement for bringing a § 1983 suit, the completed
> state administrative proceedings in *Webb* could not be
> said to have been an integral part of the federal action.

*Id.* at 52 (internal citations omitted).

In the present case, this court certified no question to the
Alabama Supreme Court. This court simply abstained initially from
adjudicating the constitutionality of District 4 pursuant to the
reasoning in *Growe v. Emison,* 507 U.S. 25, 113 S. Ct. 1075 (1993).
*Sahag I,* No. CV-94-AR-0317-M (Memorandum Opinion at 2-3, March 21,
1994). The court specifically recognized that "the state courts
[were] still struggling with this problem" in cases filed by
plaintiffs prior to their filing *Sahag I*. *Id.* at 5. This court in
its opinion specifically referenced *Hayden v. Bennett*, No. CV-93-
1032-R that was filed on May 17, 1993 in Montgomery County,
Alabama, but it also recognized the other actions for which
plaintiffs claim attorneys' fees, *Gravois v. Snowden*, No. CV-93-
385-NJ, which was filed in Shelby County on May 18, 1993, and
*Collins v. Bennett,* No. CV-93-1031, which was filed on May 18,

16

1993.³

There were no completed state administrative or court hearings when the case was refiled in this court in 1996.    The work completed in this case falls squarely under no decision that has been discussed herein.  Therefore, the court must extrapolate from the present state of the law whether the requested attorneys' fees should be awarded.

The court determines that plaintiffs may not recover attorneys' fees for their state court litigation.  Plaintiffs had a choice of forums concerning where to bring the present cause of action, they chose, at least initially, to pursue their remedy in the state courts.    This court, cognizant of this fact and respecting plaintiffs' choices, abstained from the litigation that was already well under way.    Plaintiffs' recourse to the state forum was therefore not "necessary" under *Webb* nor required under *Carey*.    Plaintiffs will recall this court's March 21, 1994, memorandum opinion dismissing *Sahag I* where it said:

> While this court may be capable of devising school board
> voting districts which meet constitutional standards, an
> effort to do so at this late date would probably cause

_____

³The *Collins* case eventually reached the Alabama Supreme Court and it was decided on September 29, 1995. *Collins v. Bennett*, 1995 WL 577029 (Ala. 1995)(not yet released for publication).  The Alabama Supreme Court remanded the case to Circuit court for further factual findings.

17

> more consternation and disruption than deferring to the
> Supreme Court of Alabama [who was already considering the
> *Hayden v. Bennett* consent decree], which, of course, will
> examine the question, whether on an expedited basis or
> not, under the language of the same United States
> Constitution and the same laws of the United States as
> this court would have applied had it not abstained.
>
> This court could not readily find that plaintiffs will be
> irreparably harmed if they do not obtain the early relief
> they seek and that their claim is sufficiently
> meritorious to permit this court to predict that they
> will ultimately prevail, but the procedural posture of
> the various related cases is a variety which, in the
> opinion of this federal court, makes federal intervention
> inappropriate because it might do more harm than good and
> would constitute an undue trespass on state sovereignty.

Merely because plaintiffs were unhappy with the then-present state
forum they and not this court chose, does not permit this court to
allow attorneys' fees under any prevailing doctrine.  The Court in
*Webb* reminded us that where plaintiffs have an independent avenue
of relief, apart from the federal forum, and where they "could go
straight to [that] court to assert it", the state proceedings do
not have the same integral function under § 1983 or the Voting
Rights Act as do required proceedings in the state court under such
statutes as Title VII. *See Webb*, 471 U.S. at 241, 105 S. Ct. at
1927.   The state fees incurred therefore were not "on the
litigation" and will be denied.  *See Hensley v. Eckerhart,* 461 U.S.
424, 103 S. Ct. 1933.

18

The result may have been different if plaintiffs first appealed to this court for relief. However, those facts are not presently before the court. Plaintiffs request for attorneys' fees insofar as those fees relate to expenses or attorney time spent in the state courts will be denied. The fact that the issues were duplicative is not necessarily relevant, much less dispositive. Plaintiffs' lawyers learned from prior litigation, much as any attorney who handles like-cases learns from prior experience, and applied such knowledge to *Sahag II*. This experience and expertise will be reflected in the hourly rate they have charged for the *Sahag II* litigation.

### 3. *Sahag I*

Plaintiffs will be allowed to recover in this case the attorneys' fees expended directly on the *Sahag I* litigation. Defendants suggest that until 1996 none of plaintiffs had standing to sue because at that point no plaintiff resided in the disputed District 4, and therefore this court had no jurisdiction to entertain *Sahag I*, much less award attorneys' fees for that litigation now. In support of their argument defendants cite *United States v. Hays*, __U.S.__, 115 S. Ct. 2431 (1995). In that case the Supreme Court declared that in order for parties to have

19

standing in a redistricting cases they must have more than a generalized grievance. *Id.* at 2435.

> Where a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment . . . and therefore has standing to challenge the legislature's action. . . . On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any interference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support hat inference.

*Id.* at 2436.   This case is binding regardless of plaintiffs' contentions that *Hays'* standing mandate was not the law at the time *Sahag I* was filed.   Judicial decisions, unlike most legislative mandates, are retroactively applied because they merely articulate the state of existing law.   Judicial decisions do not change that existing law.   Plaintiff Reese clearly has standing as District 4 resident.   The other plaintiffs do not.   However, the other plaintiffs do have standing, and defendants have not argued to the contrary, based on their contentions that the districts violated the principle of "one person one vote."      Because several plaintiffs lived in under-represented districts and because concern for "one person one vote" principally drove this court's realignment of the voting districts, plaintiffs had standing to sue in *Sahag I* and *Sahag II* on that theory.   *See Fairley v. Patterson,*

493 F.2d 598 (5th Cir. 1974). Since *Sahag I* could have been stayed rather than dismissed without prejudice this court exercises its discretion and awards plaintiffs attorneys' fees for work directly related to that litigation.

### 4. *Sahag II*

Defendants contend that they should not be liable for costs associated with the *Sahag II* litigation. Defendants premise this argument on the fact that they conceded the unconstitutionality of the contested voting districts at the initiation of *Sahag II* and that the subsequent legal battle was solely between competing plaintiffs and intervenors. Defendants make an appealing and intriguing point that mostly likely will be, and definitely should be, readdressed by the Eleventh Circuit. It is inevitable that constitutionality of almost any district drawn by a state legislature or other political body will be challenged in court,[4]

---

[4]     Before *Shaw*, state politicians who recognized that minority
        vote dilution had occurred, or was likely to occur without
        redistricting aimed at preventing it, could not only urge their
        colleagues to do the right thing under the Fourteenth
        Amendment, but counsel them *in terrorem* that losing a dilution
        case would bring liability for counsel fees under 42 U.S.C. §
        1988(b) or 42 U.S.C. § 1973l(e). But this argument is blunted
        now, perhaps eliminated in practice, by the risk of counsel
        fees in a *Shaw I* action. States seeking to comply in good faith
        with the requirements of federal civil rights laws now find
        themselves walking a tightrope: if they draw majority-black
        districts they face lawsuits under the equal protection clause;
        if they do not they face both objections under section 5 of the
        Voting Rights Act and lawsuits under section 2. The States, in
        short, have been told to get things just right, no dilution and

because competing power interests spawn dissent. The current state of law gives the wounded party, and there will always be one, to that political battle the ability to fight again another day. The state treasury is therefore placed in an unusual position of potentially being taxed, by some prevailing party, for attorneys' fees, even when the state claims it no longer has an interest in the litigation. Nevertheless, when a state creates an objectively unconstitutional district that must be redrawn, and then throws up its hands, as if in some bastardized Rule 22 interpleader action, should it not be liable as a defendant, against prevailing parties for the costs of the redraft per the attorneys' fees statutes?

The Seventh Circuit has addressed this specific issue. In a 2-1 opinion that court held that the state is liable for cleaning up the mess it creates by creating unconstitutional voting districts. *Hastert v. Illinois State Bd. of Election Comm'rs,* 28 F.3d 1430, 1444 (7th Cir. 1993), *cert. denied,* __U.S.__, 115 S. Ct. 426 (1994).

---

> no predominant consideration of race short of dilution, without being told how to do it. The tendency of these conflicting incentives is toward a stalemate, and neither the moral force of the Constitution nor the mercenary threat of liability can operate effectively in this obscurity.

*Bush v. Vera,* __U.S.__, 116 S. Ct. 1941, 2006-07 (1996)(Souter, J., dissenting) (internal cites omitted).

The State Board of Elections, the nominal defendant, has
no interest in the eventual outcome except that there *be*
an outcome which it can implement. Yet the State Board
may be held liable for fees to the prevailing parties,
whose status as such depends upon the *relative* success of
their position in relation to the success of the other
plaintiffs. These configurations of claim to liability
and of success to failure are essentially unique to
redistricting cases. In such cases, liability usually
imposed on a neutral (and nominal) defendant, and
successful fees claims are awarded to the *relatively*
successful plaintiffs. In this case, we are attempting
to apply principles developed in a wide range of civil
rights cases to the *sui generis* category of redistricting
cases.

*Id.* (emphasis in original). While not binding upon the court, the

court is persuaded by the Seventh Circuit's reasoning. The court

recognizes the unique nature of redistricting cases with regard to

attorneys' fees, and finds that in cases where the state has

pressed private litigants into service in order to remedy an

unconstitutional boundary the state must pay.

The court notes that this rationale is congruent with the

former Fifth Circuit's holding in *Ramos v. Koebig*, 638 F.2d 838,

845 (5th Cir. 1981), a case binding upon this court. In *Ramos*, the

Fifth Circuit determined that attorneys' fees would be appropriate

even though the defendant City Council admitted the

unconstitutionality of their redistricting scheme and agreed to the

court ordered injunction of that scheme. *Id.* That case is

23

somewhat different from the case at bar, in that the Council was still actively involved in the subsequent litigation.  The Council sought to have, and was successful at having, its new redistricting plan ratified in federal district court over other competing plans.

*Id.* at 841, 845.   The Fifth Circuit, in determining that plaintiffs were prevailing parties and in awarding attorneys' fees found:

> As a result of plaintiffs' suit, the Council admitted the
> unconstitutionality of the plan, and the district court
> issue an injunction prohibiting the City from holding
> elections under the 1962 plan.  That the Council was in
> good faith is no consequence.   Similarly, that the
> district court rejected plaintiffs' plan likewise is
> irrelevant. . . . Consequently plaintiffs are "prevailing
> parties" within the meaning of the Awards Act.   That the
> Council admitted the unconstitutionality of the 1962
> plan, and consented to the entry of the injunction does
> not change this result.

*Id.* at 845.   In the present case, the court similarly construes as irrelevant that defendants admitted the unconstitutionality of their plan.   While defendants here were not active participants in fashioning the subsequent court plans, they created the situation that forced plaintiffs to take legal action to remedy the harm.

This being said, the court notes the dissent of Judge Coffey in *Hastert,* where he suggested it would be "unjust" to award attorneys' fees in a case where:

24

(1) the Board has played no active role in these
proceedings and agreed to abide by the judgment of the
court,

(2) the litigation only involves plaintiffs' groups vying
against one another and above all,

(3) the redistricting should have occurred in the state
legislative forum where attorneys' fees were unavailable.

*Id.* at 1446 (Coffey, J., dissenting)(internal quotes and citations
omitted).    While a close call, in this case the court has
determined the fees are just and appropriate.

The court also distinguishes *Reeves v. Harrell*, 791 F.2d 1481
(11th Cir. 1986), *cert. denied,* 479 U.S. 1033, 107 S. Ct. 880
(1987), upon which defendants heavily rely.   That case dealt with
black sheriffs suing, pursuant to 42 U.S.C. §§ 1981 and 1983, the
Bibb County Board of Commissioners and others for unequal promotion
practices within the Bibb County sheriff's department.   Defendants
entered into a consent decree providing for 50/50 promotion quota
of blacks as to whites within the sheriff's department.   Some two
years and eight months after the consent decree was entered, white
sheriffs sought to intervene in the suit.   State defendants took no
position in the subsequent litigation and merely agreed to abide by
the consent decree.   Because of this position,

    the plaintiffs did not 'prevail' vis-a-vis the defendants
    because the defendants did not join in the motion to

intervene nor did they express any position on the
termination of the consent decree. The defendants simply
remained neutral on all of the issues raised by the
district court that they would continue to comply with
the consent decree until otherwise instructed by the
court.

Id. at 1483. While defendants in Reeves, "remained neutral", like

plaintiffs in the present action, there was no resolution of

contested issues in the present case prior to the litigation as

there had been in Reeves. In Reeves defendants were complying with

binding consent decree. More importantly, the present litigation,

unlike   Reeves,   involves   the   "sui   generis   category"   of

redistricting. It must therefore be treated differently. Pursuant

to the above reasoning, plaintiffs, who appeared in Sahag II, shall

be entitled to attorneys' fees and costs expended directly on the

Sahag II litigation.

## 5. Attorneys' Fees Due to Plaintiffs:

Pursuant to the reasoning above, plaintiffs are entitled to

fees and costs directly related to the Sahag I and Sahag II

litigations.  Plaintiffs are not entitled to any fees and costs

incurred in pursuing remedies in Alabama state courts.  Because

Mark L. Gaines and James E. Ferguson, III did not appear in the

relevant cases, their efforts cannot be compensated.

Defendants do not object to plaintiffs stated hourly rates

26

that are based on their relative experience and expertise. Plaintiffs' counsel and staff reasonably charge:

| | |
|---|---|
| Albert L. Jordan: | $200.00/hour |
| Algert S. Agricola, Jr.: | $200.00/hour |
| B. Glenn Murdock: | $175.00/hour |
| Michael L. Jackson: | $140.00/hour |
| Charles B. Campbell: | $140.00/hour |
| Paralegals: | $ 50.00/hour |
| Law Clerks: | $ 65.00/hour |
| Ferris W. Stephens | $150.00/hour |

Defendants further, except insofar as this court has addressed above, do not object to the hours plaintiffs claimed they worked on *Sahag I* and *Sahag II*. Plaintiffs counsel and staff spent the following hours directly related to *Sahag I* and *Sahag II*:

| | |
|---|---|
| Albert L. Jordan: | 344.80 hours |
| Algert S. Agricola, Jr: | 106.60 hours |
| B. Glenn Murdock: | 102.40 hours |
| Michael L. Jackson: | 3.65 hours |
| Charles B. Campbell: | 60.00 hours |
| Paralegals: | 46.95 hours |
| Law Clerks: | 3.50 hours |
| Ferris W. Stephens: | 49.25 hours |

As the Eleventh circuit has noted, "[t]he starting point in fashioning an award of attorney's fees is to multiply the number of hours reasonably expended by a reasonable right." *Loranger*, 10 F.3d at 781 (citing *Hensley*, 461 U.S. at 433, 103 S. Ct. at 1939). These "lodestar" amounts are:

| | |
|---|---|
| Albert L. Jordan: | $69,960.00 |
| Algert S. Agricola, Jr.: | $21,320.00 |

| | |
|---|---|
| B. Glenn Murdock: | $17,920.00 |
| Michael L. Jackson: | $   511.00 |
| Charles B. Campbell: | $ 8,400.00 |
| Paralegals: | $ 2,497.50 |
| Law Clerks: | $   227.50 |
| Ferris W. Stephens: | $ 7,387.50 |

The total lodestar amount state defendants must pay plaintiffs is $128,223.50.  Courts in "rare and exceptional case[s]" may adjust the lodestar amount upwards to reflect the special circumstances surrounding a particular litigation. *See Loranger*, 10 F.3d at 783. Defendants object to any upward departure from the lodestar amounts.  While this case was novel in many respects and had an obvious political twist, this court sees no reason to adjust the attorneys' fees, which are generous, upward.  It somewhat pains the court to compensate plaintiffs' attorneys substantially more than the $160.00 per hour it approved for its hard-working and extremely capable special master. If this court could get paid $200.00 per hour for the time it spends judging, its income tax liability would be substantially more than it is.

Defendants similarly do not object to any of the expenses claimed by plaintiffs for the *Sahag I* and *Sahag II* litigations before this court.  The recoverable expenses total $10,210.98. (Jordan Affidavit, Ex. A.).

Plaintiffs have also filed a supplemental motion and

28

supporting affidavits, seeking attorneys' fees for their efforts in seeking their fees.[5] Such costs are recoverable. *See Trimper v. City of Norfolk, Va.*, 58 F.3d 68, 77 (4th Cir. 1995)("it is well settled that time spent defending entitlement to attorney's fees is properly compensable under § 1988 . . .")(citation omitted); *Fewquay v. Page*, 907 F.2d 1046, 1046 (11th Cir. 1990)(plaintiff "is entitled to attorney's fees under § 1988 as a prevailing plaintiff successfully defending an attack on the award in his favor on appeal")(citing cases). "[I]t is nevertheless within the district court's discretion to determine exactly what amount would compensate the party sufficiently for the time spent on the fees phase of a law suit." *Trimper*, 58 F.3d at 77. While the court will award fees and expenses for these efforts it will cap the fees at 41%[6] of the those requested for the following reasons: (1) the majority of plaintiffs' efforts in seeking fees centered on the recovery of fees allocated to the non-recoverable state court

---

[5]Attorneys Albert L. Jordan, Algert S. Agricola, Michael L. Jackson, and Charles B. Campbell contributed work to plaintiffs' attempt to recapture attorneys' fees for seeking attorneys' fees. They request the same hourly rate that was awarded for their work in the underlying litigation and have declared that they spent 20 hours, 17.7 hours, 42.1 hours and 29 hours respectively on this issue.

[6]The 41% figure was derived by dividing the total amount of fees requested (that include not only *Sahag I* and *Sahag II*, but also fees surrounding the state court litigations) by the attorneys fees that plaintiffs recovered (namely those associated with *Sahag I* and *Sahag II*).

proceedings; and (2) this court believes that the time claimed preparing for the fees award, 108.8 total hours, was exorbitant. Therefore, plaintiffs shall be entitled to $7,172.54 for fees and their expenses of $334.89, for a total of $7507.43 relating to the fees for fees. Defendants owe plaintiffs, in total expenses and fees, $145,941.91.

### B.  Intervenors

Intervenors in the present action purportedly sought to represent the interests of black and non-black voters in District 7, and intervened in the present action to that end. Because the court has determined that intervenors lacked standing in the litigation, it cannot rule on intervenors requests for attorneys' fees.

While plaintiffs have specifically argued and shown their standing in the present litigation, intervenors have not. Intervenors are both residents of District 7 and while District 7 was affected by the subsequent Special Master's plan, adopted by this court, their district was never subject to or the victim of unconstitutional gerrymandering or vote dilution. As noted in the discussion above, the Supreme Court has stressed that parties

> who [do] not live in [a racially gerrymandered] district,
> he or she does not suffer those special harms, and any
> inference that the plaintiff has personally been

30

subjected to a racial classification would not be justified absent <u>specific evidence</u> tending to support hat inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

*Hays,* __U.S.__, 115 S. Ct. at 2436. *See also Bush v. Vera,* __U.S.__, 116 S. Ct. 1941, 1951 (1996)(emphasis added). As in *Hays,* intervenors have "pointed to *no* evidence tending to show that *they* have suffered . . . injury [from racial gerrymandering], and [this court's] review of the record has revealed none." *Id.* (emphasis in original). Nor have intervenors shown that they had ever lived in an under represented district to acquire standing under the "one person one vote" doctrine. *See Fairley,* 493 F.2d 598 (11th Cir. 1974). Indeed their motion to intervene suggests that intervenors are only generally asserting the rights of citizens in District 7 and "the State of Alabama" as a whole.

Intervenors claim:

The Attorney General's second objection with regard to standing has no merit, as this Honorable Court deemed early on that Intervenors Hall and Foster had legitimate civil rights interest to protect and that they were properly allowed to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure.

(Intervenors' Brief in Support of Attorney's Fees at 6). While this court did allow intervenors to join the ranks of litigants in

31

this case, this court has "an independent obligation to examine [its] own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *Id.* at 2435. This is an obligation the court has at any stage of litigation. Without jurisdiction, this court may not rule on intervenor's attorneys' fees requests.

A separate and appropriate order will be entered.

DONE this 31st day of January, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT

32